# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF WISCONSIN

---

BRENDON F. RIBBLE, et al.,

       Plaintiffs,

      v.                                       Case No. 09-C-643

KIMBERLY-CLARK CORPORATION, et al.,

       Defendants.

---

## DECISION AND ORDER

---

       This is a collective action for relief under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 et seq. Plaintiffs are 57 former Kimberly-Clark Corporation (K-C) employees who were fired or forced to resign over a three-year period as part of a series of reductions in force (RIFs) carried out pursuant to K-C's Global Business Plan. All but one of the plaintiffs signed severance agreements under which they agreed to release K-C from liability for any claims they had against the company in return for severance payments and other benefits. The plaintiffs who signed the agreements allege that the releases contained therein are invalid because neither the written agreements themselves, nor the documents provided contemporaneously with them, comply with The Older Workers' Benefit Protection Act (OWBPA), 29 U.S.C. § 626(f)(1).

       Recognizing that the validity of the releases was a threshold issue in the case that could prove dispositive as to almost all of the plaintiffs, the parties proposed and the Court adopted a case management plan that limited discovery to that issue in Phase I. Phase I discovery is complete, and the case is now before the Court on cross motions for summary judgment addressing the validity of the releases. A hearing was held on October 5, 2011 to address several questions the Court raised

concerning the underlying record. In response to that hearing and this Court's October 25, 2011 Order to Supplement the Record (ECF No. 168), plaintiffs and defendants submitted responses to supplement further the existing record. In particular, the Court wanted additional information on "(1) what positions within the organizational unit listed in the "Reduction In Force" paragraph were not included in Exhibit B; and (2) the number, if any, of persons holding the same job titles or classifications as those selected for termination that were not included in the Exhibit B along with their ages." (ECF No. 168 at 1–2.)

After reviewing the briefs and supplements to the record, for the reasons set forth below, the Court concludes that the disclosures required under the OWBPA were deficient as to three of the eight RIFs at issue, and the waivers signed by the plaintiffs who were terminated as part of those RIFs are therefore invalid. Plaintiffs' motion for partial summary judgment is therefore granted in part. As to the remaining RIFs, however, the undisputed material facts reveal that K-C has complied with the OWBPA and the waivers signed by the plaintiffs affected by those RIFs are therefore valid. K-C's motion for summary judgment is therefore also granted in part.

## I. Background

K-C is a global health and hygiene company with over 50,000 employees. Prior to being laid off or electing to leave K-C in exchange for severance packages, plaintiffs were employed in various positions by K-C's two wholly owned subsidiaries, Kimberly-Clark Global Sales LLC and Kimberly-Clark Worldwide, Inc. In 2003 K-C instituted a new Global Business Plan (GBP) setting forth K-C's goals for product and brand positioning, financial performance, cost cutting, and restructuring. The GBP was K-C's overall strategic business plan. While never formally reduced

2

to writing, the new GBP was the subject of a detailed 186-slide PowerPoint presentation made to K-C's board of directors on June 1, 2005. (ECF No. 34, Ex. A.) One of the many stated goals of the Global Business Plan was to cut about 10% of the company's workforce. The cuts were accomplished through retirements, normal attrition and RIFs.

K-C developed and adopted an employee benefit plan called the Global Business Plan Severance Pay Plan (GBP SPP) in order to provide severance packages to employees terminated as a result of GBP initiatives. The severance packages were offered to employees who lost their jobs as a result of GBP initiatives in return for a waiver and release of claims against K-C, including ADEA claims. The severance packages included lump sum payments and company-paid COBRA coverage, outplacement services and employee assistance programs. Additionally, employees of retirement age could choose between receiving the lump sum severance payment and the other GBP SPP benefits or an unreduced pension plus a $10,000 lump sum payment.

K-C has identified 77 separate RIFs it implemented between 2005 and 2008. Eight of the RIFs identified by K-C resulted in the terminations of one or more of the named plaintiffs. Using K-C's nomenclature, they include: Essential Sciences 2006; Adult Feminine Care Product and Technology Development (AFC P&TD) 2006; Consumer Sales 2006; Corporate Innovations 2006; North America Consumer Products (NACP) 2006; Family Care Network of the Future 2008; Corporate Innovations CIO 2008; and North American Customer Development (NACD) 2008. All but one of the plaintiffs were terminated pursuant to one of these RIFs.[1]

---

[1]Plaintiff Tony Wickham's termination was not part of any of the RIFs at issue here. K-C's motion does not address his claim.

Fifty-six of the fifty-seven plaintiffs signed Separation Agreements in which they gave K-C a full and final release of claims, including ADEA claims, in return for payments ranging from $10,000 (plus unreduced pension benefits) to almost $139,000.[2]  In all, K-C paid more than $3 million to plaintiffs in lump sum payments pursuant to the signed Separation Agreements.  Each Separation Agreement contained an acknowledgment that the signing employee had been advised by K-C to consult with an attorney in regard to the matter, that he or she had been given 45 days to decide whether to the sign the Agreement, and that he or she would have seven days after signing in which to revoke the Agreement.  The Separation Agreements signed by the fifty-five plaintiffs also contained (1) a description of the class or unit of employees who were subject to the RIF and (2) an attachment listing the job titles and ages of those employees within the group who were selected for termination and those who were not selected.  None of the plaintiffs who signed Separation Agreements elected to revoke their Agreement; nor have any returned the payments they received in return for their release of claims against K-C.

Plaintiffs challenge the validity of the waivers they signed on several grounds, the first three of which are common to all of the Separation Agreements.  First, plaintiffs contend the waivers are invalid because the Separation Agreements failed to comply with the general requirements of the OWBPA in that they improperly prohibit employees from filing charges with the EEOC.  Next, plaintiffs contend the waivers are invalid because the Separation Agreements improperly prohibit judicial review of OWBPA compliance issues.  Third, plaintiffs argue the waivers are invalid because K-C failed to advised them in writing of their right to seek legal counsel.

---

[2]Plaintiff Richard Schmidt did not sign an agreement because he did not wish to waive his potential ADEA claim against K-C.  K-C therefore does not seek summary judgment at this point as to his claim either.

Plaintiffs' primary challenge, however, is directed at K-C's attempt to comply with the OWBPA disclosure requirements in connection with the various RIFs pursuant to which their employment was terminated. Plaintiffs contend that due to its flawed reading of the OWBPA and the EEOC's interpretive regulations, K-C failed to disclose in an understandable manner the information required in order to permit the affected employees the opportunity to assess the validity of the claims they were being asked to waive. As a result, plaintiffs contend that the waivers are invalid and each of their claims must be allowed to proceed.

The Court will address each of plaintiffs' challenges, beginning with those common to each of the Separation Agreements. Before doing so, however, it will be helpful to turn to the specific requirements of the OWBPA.

## II. The Older Worker Benefits Protection Act

The Older Worker Benefits Protection Act (OWBPA), 29 U.S.C. § 629(f), "is designed to protect the rights and benefits of older workers." *Oubre v. Entergy Ops., Inc.*, 522 U.S. 422, 427 (1998). "When a worker within the class protected by the age discrimination law (age 40 and up) leaves his employment, it is common for the employer to try to obtain a waiver of the worker's right to bring a suit under that law." *Blackwell v. Cole Taylor Bank*, 152 F.3d 666, 669 (7th Cir. 1998). In order for such a waiver to be valid, the OWBPA requires the employer to provide the employee with certain information so that he or she can assess, with the assistance of counsel, the viability of such a discrimination claim. *Raczak v. Ameritech Corporation*, 103 F.3d 1257, 1259 (6th Cir. 1997). Specifically, the OWBPA provides that an individual may not waive a claim under the

5

ADEA "unless the waiver is knowing and voluntary." 29 U.S.C. § 626(f)(1). To be considered "knowing and voluntary" the waiver must comport with the following minimal requirements:

(A) the waiver is part of an agreement between the individual and the employer that is written in a manner calculated to be understood by such individual, or by the average individual eligible to participate;

(B) the waiver specifically refers to rights or claims arising under this chapter;

(C) the individual does not waive rights or claims that may arise after the date the waiver is executed;

(D) the individual waives rights or claims only in exchange for consideration in addition to anything of value to which the individual already is entitled;

(E) the individual is advised in writing to consult with an attorney prior to executing the agreement;

(F)(i) the individual is given a period of at least 21 days within which to consider the agreement; or

  (ii) if a waiver is requested in connection with an exit incentive or other employment termination program offered to a group or class of employees, the individual is given a period of at least 45 days within which to consider the agreement;

(G) the agreement provides that for a period of at least 7 days following the execution of such agreement, the individual may revoke the agreement, and the agreement shall not become effective or enforceable until the revocation period has expired;

(H) if a waiver is requested in connection with an exit incentive or other employment termination program offered to a group or class of employees, the employer (at the commencement of the period specified in subparagraph (F)) informs the individual in writing in a manner calculated to be understood by the average individual eligible to participate, as to--

  (i) any class, unit, or group of individuals covered by such program, any eligibility factors for such program, and any time limits applicable to such program; and

  (ii) the job titles and ages of all individuals eligible or selected for the program, and the ages of all individuals in the same job classification or organizational unit who are not eligible or selected for the program.

29 U.S.C. § 626(f)(1). The OWBPA also provides that "[n]o waiver may be used to justify interfering with the protected right of an employee to file a charge or participate in an investigation or proceeding conducted by the [Equal Employment Opportunity] Commission." 29 U.S.C. § 626(f)(4). Finally, the party asserting the validity of the waiver has the burden of proving that the waiver is knowing and voluntary as defined by the OWBPA in a court of competent jurisdiction. 29 U.S.C. § 626(f)(3).

Plaintiffs argue that the OWBPA is to be strictly construed and employers who request waivers of ADEA claims from their employees must strictly comply with its requirements. (Pl. Reply, ECF No. 149 at 1–3.) In support of their argument for its strict construction, plaintiffs point to the Supreme Court's discussion of the Act in *Oubre*:

> The statutory command is clear: An employee "may not waive" an ADEA claim unless the waiver or release satisfies the OWBPA's requirements. The policy of the OWBPA is likewise clear from its title: It is designed to protect the rights and benefits of older workers. The OWBPA implements Congress' policy via a strict, unqualified statutory stricture on waivers, and we are bound to take Congress at its word. Congress imposed specific duties on employers who seek releases of certain claims created by statute. Congress delineated these duties with precision and without qualification: An employee "may not waive" an ADEA claim unless the employer complies with the statute. Courts cannot with ease presume ratification of that which Congress forbids.

522 U.S. at 426–27. In view of this language, plaintiffs contend, K-C's characterization of various challenges to the Separation Agreements as "technical violations of . . . imprecise terms," the elevation of "form over substance," and "a dogmatic exercise in definition" miss the mark. (*Id*. at 2.) In plaintiffs' view, K-C's application of a "totality of the circumstances" standard is in direct conflict with *Oubre*'s "strict and unqualified" requirement. (*Id*.)

7

But plaintiffs read too much into *Oubre*. In *Oubre* the issue before the Court was whether an employee was required to tender back to the employer the severance pay she received in return for a wholly nonconforming release as a precondition to filing an ADEA claim. 522 U.S. at 424. Although general contract principles would support such a rule, the Court held that the language and purpose of the OWBPA override the common law. *Id.* at 425–27. The Court therefore concluded the employee need not return the severance pay she received as a condition precedent to bringing suit. *Id.* at 428 ("The statute governs the effect of the release on ADEA claims, and the employer cannot invoke the employee's failure to tender back as a way of excusing its own failure to comply."). Unlike this case, however, it was undisputed in *Oubre* that the defendant employer did not comply with the Act. The agreement in that case did not provide the employee the required time to consider her options. It did not allow her seven days after signing in which to change her mind. And it failed to specifically reference ADEA claims as among those she was waiving. Thus, *Oubre* did not address the standard to be used by a court to determine whether an employer's attempted compliance meets the requirements of the OWBPA. Compliance was not at issue.

The few courts that have addressed this issue have noted the disclosure required under § 626(f)(1)(H) is so imprecise, it cannot possibly require strict application. In *Raczak v. Ameritech Corp.*, 103 F.3d 1257, 1259 (6th Cir. 1997), for example, the Sixth Circuit noted that "the nomenclature of § 626(f)(1)(H) of Title 29 is ambiguous" so that "a rigid and mechanical interpretation of that provision is inappropriate." The Court reasoned that since clause (H)(ii) of § 626(f)(1) is imprecise, "[h]olding an employer strictly accountable for what might be a technical violation of these imprecise terms, with no indication that this would facilitate the provision's purpose and might even hamper it, is untenable and would elevate form over substance." *Id.* at

8

1260; *see also Burlison v. McDonald's Corp.*, 455 F.3d 1242, 1246 (11th Cir. 2006) ("The only fair conclusion, then, is that the OWBPA is ambiguous.").

Employees too have an interest in being able to effectively waive their right to assert ADEA and other claims against former employers. Potential claims against the employer may be the only leverage an employee facing a RIF has in seeking favorable severance terms. Employers willing to offer generous severance packages in return for such a waiver may have little incentive to offer the same benefits to employees if the rules governing waivers are so uncertain that the validity of *any* waiver the employees sign is questionable at best. The fact that, as the Court held in *Oubre*, employees who sign waivers can sue their employers without first returning the benefits they received as a condition of waiving their claims reduces even further employers' incentive to offer such packages absent some assurance that the waiver will ultimately (and likely) be enforceable. Employees are poorly served by a construction of the OWBPA that creates so high a standard that employers despair of meeting it. Here, the vast majority of the K-C employees who received severance packages have not sued. To the extent this suggests that most of the former employees did not have viable claims against K-C, they clearly benefitted from K-C's program. These considerations suggest that an unduly high standard for determining OWBPA compliance should be avoided.

The Court therefore concludes that while an employer must comply with the requirements of the OWBPA in order to obtain a valid waiver, the imprecise language of the statute requires that compliance be measured in relation to the purpose underlying the act. *See Adams v. Ameritech Servs., Inc.*, 231 F.3d 414, 431 (7th Cir. 2000) (noting that "a literal approach to the statute could lead to hypertechnical requirements that have little to do with the purpose of the law."). It is with these principles in mind that I address the parties' cross motions for summary judgment.

### III. Summary Judgment Standard

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party has the initial burden of demonstrating that it is entitled to summary judgment. *Id.* at 323. Once this burden is met, the nonmoving party must designate specific facts to support or defend its case. *Id.* at 322-24.

In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The mere existence of some factual dispute does not defeat a summary judgment motion, however; there must be a genuine issue of material fact for the case to survive. *Id.* at 247-48.

"Material" means that the factual dispute must be outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir. 1997). Failure to support any essential element of a claim renders all other facts immaterial. *Celotex*, 477 U.S. at 323. A "genuine" issue of material fact requires specific and sufficient evidence that, if believed by a jury, would actually support a verdict in the nonmovant's favor. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 249. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

It is important to note that K-C, as the party asserting the validity of the waiver, has the burden of proving that the waiver is knowing and voluntary as defined by the OWBPA. 29 U.S.C. § 626(f)(3). The party who has the burden of proof at trial has a significantly different burden on

summary judgment than the party who does not. The party who has the burden of proof at trial must show that the evidence supporting his claim is so compelling that no reasonable jury could return a verdict for his opponent. *Select Creations, Inc. v. Paliafito America, Inc.*, 911 F. Supp. 1130, 1149 (E.D. Wis. 1995) (citing *Anderson*, 477 U.S. at 248). The party without the burden of proof at trial, on the other hand, need only inform the court of "the basis of its motion and identif[y] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The burden then shifts to the other party to designate specific facts to support or defend each element of the cause of action, showing that there is a genuine issue for trial. *Id.* at 322-24. In other words, to obtain summary judgment on the validity of the waivers here, K-C must demonstrate that its evidence leaves no room for an adverse finding on each requirement of the OWBPA; whereas to avoid summary judgment in favor of the plaintiffs, K-C must demonstrate that there is sufficient evidence in its favor to create a jury issue. *Winskunas v. Birnbaum*, 23 F.3d 1264, 1267–68 (7th Cir. 1994); *Select Creations, Inc.*, 911 F. Supp. at 1150.

## VI. Plaintiffs' Common Challenges To The Validity Of Their Waivers

### A. Prohibition Of EEOC Charges

Federal regulations prohibit separation agreements from waiving the employee's right to file a charge with the EEOC. *See* 29 C.F.R. § 1625.22(i)(2)(I) (stating that "[n]o waiver agreement may include any provision prohibiting any individual from . . . [f]iling a charge or complaint . . . with the EEOC."). Plaintiffs argue the separation agreements they signed contain such a prohibited waiver. Put another way, plaintiffs aver K-C's waivers are invalid because language contained therein equates to an improper attempt to ban the filing of EEOC charges.

Plaintiffs' argument fails for two reasons. First, the waivers do not prohibit employees from filing EEOC charges. If the waivers did contain such a ban, the ban would be invalid since the OWBPA expressly prohibits any waiver from affecting the EEOC's rights and responsibilities to enforce anti-discrimination laws and from interfering with the protected right of an employee to file a charge or participate in an investigation conducted by the EEOC. Plaintiffs' argument also fails because, unlike the other information § 626(f)(1) requires the employer to convey to the employee, there is no requirement that the ban against waivers of EEOC charges be set forth in the waiver agreement.

The separation agreements at issue include several paragraphs of broad waiver language detailing all the claims an employee gives up by signing the agreement. Immediately following these broad paragraphs is exclusionary language: "the above release . . . excludes any other claim which cannot be released by private agreement." K-C argues this sentence notifies employees they are not prohibited from filing a charge with the EEOC simply by signing the agreement. Plaintiffs argue K-C's language is vague and overly generalized, especially when considered in conjunction with other specific language from the separation agreements. (Pl.'s Mem. in Sup., ECF No. 71 at 13)(quoting language from 2006 and 2008 separation agreements.) Plaintiffs argue this uniquely broad language could lead an employee to believe that by signing the separation agreement he or she is giving up a multitude of rights, including the right to file a charge with the EEOC.

Certainly K-C's language could have been more explicit regarding the right to pursue a charge with the EEOC. Indeed, K-C has since modified its waiver form. But simply because the language could have been clearer does not mean that the language impermissibly *prohibited* a signing employee from later filing a charge with the EEOC. Indeed, many of the plaintiffs in this

action both signed the waivers with the disputed language *and* still filed EEOC charges; over seventy-five percent of plaintiffs signed waivers and later filed EEOC charges. (Def.'s Stmt. Prop. Mat'l Facts "DSF" ¶ 367, ECF No. 79.) This fact demonstrates that even many plaintiffs themselves did not believe the waiver prohibited them from filing a charge with the EEOC. It also undermines any argument plaintiffs may have that K-C's waiver language was not written in such a manner calculated to be understood by the average individual eligible to participate. Many of the plaintiffs — who were primarily educated professional workers — understood at some point that they had *not* given up their right to file an EEOC charge simply because they signed the waivers. (DSF ¶¶ 62–65.)

In fact, the EEOC's *own* sample waiver is remarkably similar to the waiver language used by K-C. The EEOC sample includes the language: "Except as to all claims that cannot be released under applicable law..." (Ex. A to K-C Br., ECF No. 130.) This is similar to K-C's 2008 and 2009 waivers, which contained the language: "the above release . . . excludes any other claim which cannot be released by private agreement." Neither the EEOC sample waiver nor the K-C waiver affirmatively state that an employee retains the right to file an EEOC charge despite signing a waiver. In other words, the regulations simply do not require that an employer list each *specific* non-waivable right in a separation agreement. There are several such non-waivable claims: claims for unemployment, claims for workers compensation, claims for COBRA benfits, and FLSA and ERISA claims. (*Id.*) Nothing in the regulations or controlling law requires a separation agreement to list, by name, each of the non-waivable claims.

In *Thomforde v. IBM*, 406 F.3d 500 (8th Cir. 2005), the Eighth Circuit held a General Release And Covenant Not To Sue invalid under the OWBPA because, by attempting to make clear

that the employee retained his right to file with the EEOC and sue for age discrimination, the release failed to make clear that to the employee that he was waiving any age discrimination claim he might have had: "Without a clear understanding of the legal differences between a release and a covenant not to sue, these provisions would seem to be contradictory; how can an employee bring a suit solely under the ADEA if the employee has waived all claims under the ADEA?" *Id.* at 503. Since the employee could have reasonably understood he was not waiving his potential ADEA claim, the Court held the release invalid. Here, by contrast, the employees harbored no confusion over the fact that they were being asked to waive any potential ADEA claims they might have had. If anything, the fact that they might have thought the waiver was even broader would have caused them to exercise greater care in reaching a decision. *See also Ridinger v. Dow Jones & Company, Inc.*, 651 F.3d 309, 316 (2nd Cir. 2011) ("Ridinger has pointed to nothing in the Separation Agreement that could have led him to believe he retained the right to bring an action alleging age discrimination in violation of the ADEA, rather than simply an action challenging the validity of the Separation Agreement.").

In sum, I conclude as a matter of law that K-C's separation agreements do not contain a charge filing ban. While the agreements could have more explicitly stated that a signing employee retains the right to file a charge with the EEOC, such specificity is not required. There is no genuine issue of material fact regarding plaintiffs' allegation that K-C's separation agreement includes a charge filing ban because a plain reading of the K-C waiver language cannot support plaintiffs' view. But even assuming the K-C separation agreements did contain a charge filing ban, such a ban would be severable and thus would not invalidate the entire agreement. The agreements explicitly state that "[t]he provisions of this Agreement are severable, and if any part of the is Agreement is

14

found by a court of law to be unenforceable, the remainder of the Agreement will continue to be valid and effective."  (DSF ¶ 371.)

Courts have concluded a charge filing ban can be severed.  *See Cosmair*, 821 F.2d at 1090–91 ("the fact that a waiver of the right to file a charge is void does not invalidate a waiver of a cause of action with which it is conjoined."); *see also Theissen v. General Elec. Capital Corp*., 232 F. Supp.2d 1230, 1242–43 (D. Kan. 2002) ("[T]he court is unwilling to conclude that an otherwise knowing and voluntary waiver would be invalid simply because the language of the waiver could be interpreted to interfere with the employee's right to communicate with the EEOC when communications with the EEOC are simply not an issue in the litigation").  Such an analysis is supported by the plain text and structure of the OWBPA.  Nothing in the language of the OWBPA suggests that a waiver is rendered invalid if it fails to explain clearly an employer cannot prohibit employees from filing charges or cooperating with the EEOC.  And the structure of OWBPA indicates that the presence of a charge filing ban does not, *per se*, invalidate a separation agreement:

> [T]he statutory framework of the OWBPA reflects that section 626(f)(4) is not one of the minimum requirements for a knowing and voluntary waiver; those minimum requirements are enumerated in section 626(f)(1). Similarly, the language of section 626(f)(4) — in stark contrast to the language of section 626(f)(1) — in no way suggests that a waiver that restricts the right of an individual to communicate with the EEOC is automatically rendered invalid or that it may not be considered knowing and voluntary.

*Theissen*, 232 F. Supp. 2d at 1242.  In light of the structure of section 626(f), this Court is unpersuaded that the presence of a charge filing ban — in and of itself — renders an entire separation agreement invalid.  This is especially true where, as here, the language contained in K-C's separation agreement has in no way been used to justify interfering with the protected right of an employee to file a charge with the EEOC.  Accordingly, plaintiffs are not entitled to relief on the ground that the waiver prohibited them from filing charges with the EEOC.

## B. Right to Seek Judicial Review of OWBPA Compliance Issues

Plaintiffs next argue the waivers are invalid because they prohibit them from seeking judicial review for OWBPA compliance. According to plaintiffs, this alleged prohibition renders the waivers unenforceable. Again, plaintiffs' argument fails both because the agreements contain no such prohibition and because, even if they did, it would not render the waiver invalid.

K-C has never claimed the separation agreements bar the plaintiffs from testing the validity of the releases in court. As K-C points out, the agreements contain a release of claims, which is an affirmative defense to a claim asserted in a lawsuit, but not a covenant not to sue. The distinction may not be clear to a non-lawyer, but employers are not required to provide a law school education as a condition of obtaining a valid waiver. Instead, the employer is required to advise the employee in writing to consult with an attorney. Section 626(f)(1)(E). Nothing in the language of the OWBPA or the regulations thereunder requires employers to explain in releases that employees have the right to seek a judicial determination whether the waiver they have agreed to is valid. This is not a part of the information that employees need in order to assess the viability of the claims they are being asked to waive. And to the extent the plaintiffs may have thought they would actually be giving up such a right, it would have made the waiver *less*, rather than more, attractive. In other words, the disclosure did not minimize the limitations and thereby induce an employee to sign the agreement without realizing the extent of rights he was relinquishing. *See* 29 C.F.R. § 1625.22(b)(4) ("The waiver agreement must not have the effect of misleading, misinforming, or failing to inform participants and affected individuals. Any advantages or disadvantages described shall be presented without either exaggerating the benefits or minimizing the limitations.").

Finally, the fact that K-C has asserted counterclaims against the plaintiffs for breach of contract does not change the result. The counterclaims are apparently contingent claims that K-C would pursue in the event that the releases given by the plaintiffs are found invalid and they prevail on their claims against K-C. Alternative and inconsistent claims are permitted under federal pleading rules. Fed. R. Civ. P. 8(d). If in fact plaintiffs pursue and recover on claims they agreed to release, then it is arguable they are in breach of the separation agreements and K-C may be entitled to recover the value of the severance benefits it gave plaintiffs in damages, at least as a set-off. *See* 29 C.F.R. § 1625.23(c)(1). On the other hand, if the releases are effective, then K-C will have received what it bargained for and its counterclaims presumably would be dismissed. The fact that K-C has filed counterclaims, however, is immaterial to the validity of the plaintiffs' waivers. For now, the issue is beyond the scope of Phase One, pursuant to this Court's previous order, Docket 10.

## C. Advice to Seek Legal Counsel

Plaintiffs also contend the separation agreements are invalid because they do not adequately advise employees to seek the advice of counsel. Under the OWBPA a waiver will not be considered "knowing and voluntary" unless "the individual is advised in writing to consult with an attorney prior to executing the agreement[.]" 29 U.S.C. § 626(f)(1)(E). K-C's separation agreements include the following language: "[Employee] acknowledges that he [or she] has been advised by K-C to consult with an attorney in regard to this matter." (DSF ¶ 33.) Plaintiffs argue that this language fails because it states that the employee *has been advised* (past tense) but does not instruct the employee *to* consult (present tense) with a lawyer.

17

Ultimately, plaintiffs' argument amounts to a distinction without a difference. The separation agreements at issue here are in writing and plainly indicate that plaintiffs were advised "to consult" with an attorney before signing the agreement. *Cf. American Airlines, Inc v. Cardoza-Rodriguez*, 133 F.3d 111, 118 (1st Cir. 1998) ("because American failed to directly advise their employees to consult a lawyer before making the election, we rule, as a matter of law, that American failed to meet its burden under the OWBPA."). Courts have found language similar to K-C's language to be in compliance with the OWBPA. *See Jones v. Asset Acceptance, LLC*, 2008 WL 4080269, *3–4 (M.D. Fla. Aug. 28, 2008) (OWBPA complied with where employee "advised to and . . . had the opportunity to consult with an attorney prior to executing"); *see also Moroni v. Penwest Pharmacueticals Co.*, 2009 WL 3335504, *8–9 (D.N.J. Oct 13, 2009) (language "you were advised to consult with an attorney about Agreement before signing it" complies with OWBPA). K-C's agreements also comport with EEOC guidance that a "waiver must advise the employee in writing to consult an attorney before accepting the agreement." (Ex. A to K-C Br, ECF No.130 at Sec. IV(A)(6).) Both the EEOC's own sample agreement and K-C's agreement use past tense: K-C's agreement states that the employee "has been advised" and the EEOC's sample states that "you were advised" to consult with an attorney. (*Id.*) Moreover, K-C gave plaintiffs the entire required time — 45 days — to read and act on the attorney advice provisions contained in the separation agreements. There is no genuine issue of material fact regarding the attorney advisement language where, as here, all fifty-six plaintiffs admit that K-C advised them in writing to consult with an attorney prior to signing their releases, and several did so consult. (Def.'s Stmt. Add'l Facts "DSAF" ¶ 1, ECF No. 131; DSF ¶ 46.) Accordingly, plaintiffs' allegation that K-C failed to advise them in writing of their right to consult an attorney fails.

## V. Decisional Units

Having addressed and set aside the common challenges plaintiffs asserted to the validity of their releases, I turn now to the primary issue in dispute: whether the informational disclosures relating to the various RIFs was sufficient under the OWBPA.

The OWBPA requires a more detailed informational disclosure when a waiver is sought "in connection with an exit incentive or other employment termination program offered to a group or class of employees." Section 626(f)(1)(H). In those cases, as noted above, the employer must:

> inform[ ] the individual in writing in a manner calculated to be understood by the average individual eligible to participate, as to-
>
> (i) any class, unit, or group of individuals covered by such program, any eligibility factors for such program, and any time limits applicable to such program; and
>
> (ii) the job titles and ages of all individuals eligible or selected for the program, and the ages of all individuals in the same job classification or organizational unit who are not eligible or selected for the program.

29 U.S.C. § 626(f)(1)(H). Precisely what these subsections require is the focus of plaintiffs' principal challenge to the validity of their waivers.

The purpose of this provision is "to ensure that older employees are provided with information necessary to evaluate any potential ADEA claims they may have before deciding to release them." *Burlison*, 455 F.3d at 1247. In evaluating whether the employer's § 626(f)(1)(H) disclosure was sufficient, then, the relevant question is whether the employees were "provided with the age and job-title information that would be relevant if the employees were to bring an age discrimination claim arising out of their termination." *Adams v. Moore Business Forms, Inc.*, 224 F.3d 324, 329 (4th Cir. 2000). To achieve this goal, the OWBPA first requires the employer to inform the employees as to "any class, unit, or group of individuals covered by such program." Section 626(f)(1)(H)(i).

19

The regulations implementing the OWBPA address the required disclosure for group employment termination programs. These regulations refer to the "class, unit or group" in which the terminations are made as the "decisional unit":

> When identifying the scope of the "class, unit, or group," and "job classification or organizational unit," an employer should consider its organizational structure and decision-making process. A "decisional unit" is that portion of the employer's organizational structure from which the employer chose the persons who would be offered consideration for the signing of a waiver and those who would not be offered consideration for the signing of a waiver. The term "decisional unit" has been developed to reflect the process by which an employer chose certain employees for a program and ruled out others from that program.

29 C.F.R. § 1625.22(f)(3)(i)(B)

The terms "class, unit, or group" depict abstract concepts that are used to organize individual members of a workforce. The makeup of the decisional unit may vary widely depending upon the purpose of the classifier. The regulations recognize as much, noting that "[w]hen identifying the population of the decisional unit, the employer acts on a case-by-case basis, and thus the determination of the appropriate class, unit, or group, and job classification or organizational unit for purposes of section 7(f)(1)(H) of the ADEA also must be made on a case-by-case basis." 29 C.F.R. § 1625.22(f)(3)(ii)(A). The term "decisional unit" captures the flexibility and indeterminate character of the concept.

In a large and complex corporate structure, such as the one in existence at K-C, it would seemingly always be possible to include or exclude a few additional employees when formulating a decisional unit. Should the marketing department include employees in advertising or those in sales? Should the research and development group include product testing employees? Should the janitorial group include the landscape employees? The regulations do not answer questions like

these, perhaps because such groupings, departments, and teams can and do vary from company to company. *See Raczak v. Ameritech Corp.*, 103 F.3d 1257, 1262 (6th Cir. 1997) (stating that the terms "job title," "job classification," and "organizational unit" should be interpreted on a case-by-case basis). Given the malleability of these nebulous terms, then, the question becomes "who decides" what constitutes a relevant job title, classification, or organizational unit. The plain language of the regulations indicates the decision belongs to the employer. *See* 29 C.F.R. § 1625.22(f)(3)(ii)(D) ("If an *employer* seeks to terminate employees by exclusively considering a particular portion or subgroup of its operations at a specific facility, then *that* subgroup or portion of the work force at the facility will be considered the decisional unit.") (emphasis added). At its core, a "decisional unit" should "reflect the process by which an employer chose certain employees for a [reduction in force] program and ruled out others from that program." 29 C.F.R. § 1625.22(f)(3)(i)(B). Assuming that the employer's identification of class, unit or group of employees from which the employees selected for separation were chosen reasonably describes an existing organizational unit within the company, the employer's designation should stand.

The decisional unit need not include an entire department or division within the organization. The regulations provide "if an employer seeks to terminate employees by exclusively considering a particular portion or subgroup of its operations at a specific facility, then that subgroup or portion of the workforce at that facility will be considered the decisional unit." 29 C.F.R. § 1625.22(f)(3)(ii)(D). Thus, if the employer decides to reduce the number of employees in a department working in a particular area, the entire department would not be the decisional unit. But the employer must make clear in its disclosure what portion of the department was considered. It is not enough to say "certain positions" within a grouping were considered without informing the

affected employee in a manner he is likely to understand what positions within the department were considered. Otherwise, the employer would be free to disguise statistical evidence suggesting discriminatory intent by selectively excluding positions within a given organizational unit currently held by younger employees.

Moreover, when the decisional unit is less than the entire department or organizational unit, the criteria used to narrow the unit, the so-called "eligibility factors," must be reasonably objective. Otherwise, the entire department will be considered the decisional unit. Here, too, the regulations provide an illustrative example:

> If the terminees are selected from a subset of a decisional unit, the employer must still disclose information for the entire population of the decisional unit. For example, if the employer decides that a 10% RIF in the Accounting Department will come from the accountants whose performance is in the bottom one-third of the Division, the employer still must disclose information for all employees in the Accounting Department, even those who are the highest rated.

29 C.F.R. § 1625.22(f)(4)(v). While perhaps not as explicit as it could be, this regulation still clarifies an important principle in outlining the limits on an employer's ability to define a decisional unit. The regulations define, in their example, the acceptable decisional unit as the "Accounting Department." An employer may not, by the logic of this example, define a decisional unit as "the bottom one-third of the Accounting Department." In other words, the employer has discretion to choose its own relevant objective criteria in creating the decisional unit. The regulations do not take issue with whether the employer defines the relevant decisional unit as the "Accounting Department" or the broader "Finance Department" or even the narrower "Tax Accounting Department." Geography, education level, job title, seniority, current job focus — all of these types of objective criteria are permissible bases for an employer's determination of a decisional unit.

Squishy, manipulable, subjective criteria, on the other hand — even criteria couched in purportedly quantified terms, such as "performance" rankings — are impermissible means of creating a decisional unit, according to the regulation. Given the concerns regarding an employer's incentive to manipulate statistics and the relevant decisional pool, the regulations understandably prohibit an employer from arguing, tautologically, that its "decisional unit" is simply "the employees it decided were eligible."

The necessity of a prohibition on subjective criteria as the basis for a decisional unit is most evident in light of the OWBPA's other requirements and its purpose. Most significantly, terminated employees must be adequately *advised* of the group of employees considered for termination, in order to determine whether discrimination existed. Thus, in order for a terminated employee to assess, meaningfully, whether or not discrimination played a role in his or her release, the employer must describe the relevant decisional unit in *objective* terms, consistent with the OWBPA and the regulations. *See Kruchowski v. Weyerhaeuser Co.*, 446 F.3d 1090, 1094-95 (10th Cir. 2006) (holding that when the decisional unit identified in severance agreement differs from the actual decisional unit used, waiver is invalid).

In addition to informing employees selected for termination of the decisional unit that is the subject of the RIF, the employer must also inform the affected employee of "the job titles and ages of all individuals eligible or selected for the program, and the ages of all individuals in the same job classification or organizational unit who are not eligible or selected for the program." 29 U.S.C. § 626(f)(1)(H)(ii). The employer must include the job titles and ages of all of the employees within the decisional unit and indicate those who were retained and those whose employment was terminated.

Finally, the regulations also set out "special rules" for "[a]n involuntary termination program in a decisional unit" which "take[s] place in increments over a period of time." 29 C.F.R. § 1625.22(f)(4)(vi). "Specifically, information supplied with regard to the involuntary termination program should be cumulative, so that later terminees are provided ages and job titles or categories, as appropriate, for all persons in the decisional unit at the beginning of the program and for all persons terminated to date." *Id.* Cumulative disclosures are not required, however, simply because an employer uses multiple RIFs over a period of time. The language of the regulation indicates that the employer must provide a cumulative disclosure only when the successive terminations occur within the same decisional unit as part of the same termination program.

Plaintiffs' overarching argument is that K-C's "Global Business Plan was an involuntary termination program" that really "took place" in three decisional units now identified by plaintiffs. (Pl. Opp. Br., Dkt. 125 at 17.) Plaintiffs contend that what K-C has identified as the eight RIFs pursuant to which the employment of 52 of their number were terminated were in fact components or increments of three larger RIFs that were implemented over time in three overall decisional units. Plaintiffs contend that the Essential Sciences 2006 RIF, for example, was in fact an increment of a larger RIF the decisional unit of which was the entire R&D/CIO Organization. The other RIFs that K-C implemented in this decisional unit, according to plaintiffs, included the 2005 Analytical and Measurement Technology (AMT) and Product and Technology Development (P&TD) RIF, the 2006 Corporate Inovation Organization RIF, and the 2008 Enterprise Growth Incubator (EGI) RIF. The 2006 AFC P&TD RIF, plaintiffs contend, was part of a larger RIF affecting the Personal Care Product and Technology Development decisional unit that also included the NACP RIF which took place in September of 2006, as well as an earlier NACP RIF that took place a month earlier in

August of 2006. And the 2006 Consumer Sales RIF, plaintiffs argue, was part of a larger RIF affecting a decisional unit plaintiffs identify as the NACP Customer Development Organization, which also included the 2007 Sales RIFs and the 2008 NACD RIF. Plaintiffs contend that the five remaining individual plaintiffs were not part of any of the decisional units, though three of the five were included by K-C in the September 2006 NACP RIF.

If this is true, plaintiffs contend that K-C then should have listed the employees chosen in its earlier RIFs in each RIF that followed. This was clearly not required, however, and would have made its disclosures far more confusing. Contrary to plaintiffs' contention, K-C's Global Business Plan was *not* an involuntary termination program and thus did *not* trigger cumulative disclosures. Rather, the Global Business Plan covered K-C's general global strategy including management of K-C's portfolio of brands and products, financial performance objectives, cost cutting, and restructuring. The 186-slide PowerPoint presentation to K-C's Board of Directors regarding the Global Business Plan — the only written recitation of the Plan — first refers to a "net headcount reduction of between 4,500 and 5,5000 [employees]" on slide number 77 and makes only passing references to such reductions thereafter. (Dkt. 34, Ex. A.) The fact that *one component* of the Global Business Plan involved cost cutting measures — such as shrinking K-C's workforce — does not mean that the Global Business Plan was itself an "involuntary termination program" under the OWBPA. Indeed, the Global Business Plan does not meet the definition of an "involuntary termination program" because it does not specifically refer to a "group or class of employees who were involuntarily terminated and who are offered additional consideration in return for their decision to sign a waiver." 29 C.F.R. § 1625.22(f)(1)(iii)(A). Instead it sets out wide-reaching general corporate goals that include the goal of reducing headcount. Reductions can be

25

accomplished by attrition and other programs besides involuntary terminations. Simply because K-C's Global Business Plan included a Severance Pay Plan does not transform it into an involuntary termination program. The fact that a company with over 50,000 employees happens to list among its stated goals its intent to reduce costs and eliminate staff, and provides funds to pay severance, is simply insufficient to turn the company's business plan into an involuntary termination plan for purposes of the OWBPA. I therefore conclude that the Global Business Plan did not require K-C to make cumulative disclosures as part of its separate reductions-in-force and now turn to the various RIFs which resulted in the plaintiffs' terminations.

### 1. Essential Sciences

Plaintiff Bruce Achter was terminated as a result of the Essential Sciences RIF in March 2006. (Foster Aff., Ex. 4.) He was one of six employees terminated under this RIF. The Separation Agreement Achter signed informed him that "[e]mployees in specific organizations within the Essential Sciences Department are eligible for the reduction-in-force program" and provided a list of the ages and job titles of all 79 employees who were considered for the RIF. (DSF ¶¶ 90–92.) The Agreement did not say what "specific organizations" were included, however, and whether all of the employees within those organizations were included, or just some of them.

This vague description fails to convey an essential element Achter needed in order to assess the validity of a possible age discrimination claim – namely, the actual group of employees that were considered for termination. In its brief, K-C explains that employees reporting to two specific managers were those considered within the Essential Sciences Department. This may very well be true, but K-C's failure to describe these limitations, or the "eligibility factors," to the terminated employees renders meaningless its veracity or good faith in selecting the unit. Under OWBPA an

employer not only has an obligation to make appropriate judgments with respect to decisional units, but must also provide meaningful notice to terminated employees as to the specific group of employees who were considered – in other words, who was included within the decisional unit. *See Kruchowski*, 446 F.3d at 1093-94 (employer failed to comply with OWBPA requirement that terminated employees be informed of decisional unit at time they consider whether to waive any ADEA claims when Group Termination Notice established decisional unit as all salaried employees of mill but employer later indicated that decisional unit was only those salaried employees who reported to certain manager).

"Employees in specific organizations within the Essential Sciences Department" does not give terminated employees the tools to make an informed choice as to whether they were singled out because of their age. Under this vague description, K-C could have left out a large number of younger employees within the same department who were never considered for termination, thereby disguising the fact that older workers were over-represented among those who were terminated. While this may not have occurred, without an adequate description of the relevant group, employees have no meaningful way to evaluate the merits of their potential discrimination claims. Thus while "Essential Sciences" might have been a perfectly acceptable decisional unit, "some employees from Essential Sciences" is not acceptable without providing more detail as to the objective criteria used to narrow the number of employees within the Essential Sciences Department that were considered. K-C's supplement states that the Exhibit B to the Essential Sciences 2006 RIF Separation Agreement did not identify the employees reporting directly to Directors Everett, Daley, or Wilks, which comprised 63 employees. (ECF No. 172 ¶ 7.) By failing to provide employees with this information, K-C essentially cut out almost half of the employees fitting within the vague

description of "some employees from Essential Sciences" and therefore did not give the affected employees an adequate opportunity to assess their claims.

As noted above, the regulations themselves suggest that if less than an entire department of a facility is considered, the narrowing must be according to objective criteria. K-C both failed to describe how terminees were selected from a subset of a decisional unit and failed to supply the information for the entire population of the decisional unit. Thus, the waivers in this RIF could not have been "knowing and voluntary" within the meaning of the OWBPA and are accordingly invalid.

## 2. Adult Feminine Care Product and Technology Development 2006

Forty-eight employees, eighteen of whom are plaintiffs, were terminated as a result of the Adult Feminine Care Product and Technology Development (AFC P&TD) RIF in July 2006. The Separation Agreements signed by these plaintiffs informed them that "[p]ositions in Adult/Feminine Care P&TD Department were considered for this program as part of a departmental redesign." (DSF ¶ 110.) Although the Separation Agreement did not specify which positions in the AFC P&DT Department were considered, K-C stated in its supplemental findings that all of the positions were included, with the exception of three directors; one vice president; and three hourly pilot facility operators who worked on AFC P&TD projects, were paid out of a separate budget, and worked out of separate facility. (ECF No. 172 ¶ 13.) While it would have been better for K-C to note which positions within AFC P&TD were excluded in the Separation Agreement, the fact that these positions were not included would have been clear from the attached Exhibit B, which listed the job titles and ages of the 191 AFC P&TD employees within the decisional unit that were considered for

termination.[3]  Under the circumstances, any error in not listing the three directors, vice president, and three hourly pilot facility operators was de minimis.  Compare *Kruchowski*, 446 F.3d at 1095 (rejecting argument that failure to include fifteen employees representing ten percent of the workforce was di minimis).  I therefore conclude that K-C's disclosure was sufficient.

Plaintiffs' argument that the AFC P&TD RIF was actually part of a larger RIF is not supported by the record.  In essence, their contention is that because K-C was also in the process of reorganizing its various departments, it should have treated them as one decisional unit.  Since K-C's disclosures identified only the pre-reorganization departments or units, and did not include the ages of all individuals in the reorganized department, plaintiffs argue they were deficient.  But the fact that K-C planned to reorganize or combine various departments does not mean that a RIF implemented before the reorganization takes place must encompass the members of the other departments that the reorganization will affect.  If management concludes that the AFC P&TD Department is overstaffed or over budget, for example, there is no reason it may not implement a RIF affecting only that department before moving forward with plans to combine it with other departments.  The decisional unit remains AFC P&TD even though there may be plans to combine that department with others down the road.

Plaintiffs also take issue with K-C's contention that the AFC P&TD RIF was motivated by budgetary concerns, whereas the pertinent Separation Agreements stated that the RIF was "part of a department redesign."  (Foster Aff., Ex. 5, ¶ 15.)  But whether it was motivated by budgetary

---

[3] I also note that higher level employees are not analogous to those clearly being considered for the RIF.  An over-inclusion of information can be just as problematic as an under-inclusion to an employee attempting to assess the likelihood of success of a discrimination claim.  As managerial positions perform different functions, have different salaries, and are not analogous, this Court has no issue with K-C's decision to exclude them, in this RIF or elsewhere, from Exhibit B.

considerations, plans for a department redesign, or both makes no difference, as long as the RIF was limited to the AFC P&TD Department. It is the decisional unit that the employer is required to identify pursuant to § 626(1)(f)(H)(i), not the motivation for it, that determines the scope of the disclosure required under § 626(1)(f)(H)(ii).

In its challenge to each of K-C's § 626(1)(f)(H) disclosures, plaintiffs repeatedly seek to combine RIFs in different decisional units so as to invoke the cumulative disclosure rule. But the cumulative disclosure rule only applies to RIFs in the same decisional unit that are intended to take place in increments over time. *See* 29 C.F.R. § 1625.22(f)(4)(vi) ("An involuntary termination program in *a* decisional unit may take place in successive increments over a period of time.") (italics added). RIFs that are implemented in different decisional units are not subject to the cumulative disclosure rule. Here, the undisputed evidence establishes that K-C implemented a RIF in the AFC P&TD Department in July of 2006. Having elected to reduce positions in that department, K-C was not required to include in its disclosure job classifications and ages of employees from other departments in order for plaintiffs' waivers to be valid.

Finally, Plaintffs argue that K-C's Exhibit B disclosures for the AFC P&TD RIF understated the number of employees in the department by 31. Since the Exhibit B did not list the job classifications and ages of all of the employees within the decisional unit who were not terminated, plaintiffs argue it is deficient and their waivers are therefore invalid. As K-C points out, however, plaintiffs' argument is based on an older organizational chart that reflects the number of employees within the AFC P&TD Department as of December of 2005, not June of 2006. The number of employees within the decisional unit was 191 by June of 2006 when the RIF was implemented due to previous transfers, retirements and resignations.

I conclude that the separation agreements are valid because they describe with the requisite specificity (using objective criteria) the positions in the AFC P&TD Department considered for this program as part of a departmental redesign. Employees terminated as part of the AFC P&TD RIF could make an "informed choice" so as to make their waivers "knowing and voluntary." The waivers in this department are therefore valid.

### 3. Consumer Sales 2006

One hundred employees, fourteen of whom are plaintiffs, received notification of termination in 2006 and the relevant decisional unit was identified as: "Consumer Sales employees in Customer Team East, Customer Team Metro, Customer Team Retail, Customer Team Safeway, Category Space Management, Eastern Region, Midwest Region, and Western Region are eligible for the reduction-in-force program." (DSF ¶ 148.) Exhibit B for this RIF listed the job titles and ages of the 257 employees within the decisional unit and noted the employees that had/had not been selected for termination. (DSF ¶ 150.) This RIF was caused by restructuring certain portions of the Consumer Sales Organization. (DSF ¶¶ 124, 125, 127.) The leaders of the teams that faced cuts provided input and the decisions were made by K-C's General Manger of U.S. Retail Operations and the four Regional Directors who reported to him. (DSF ¶¶ 119, 121, 123, 133–35, 138, 141.)

The disclosure is sufficient. The description provides sufficient notice as to the decisional unit from which the terminated employees are drawn. Although K-C did not include on the accompanying Exhibit B six administrative assistants who held the only non-exempt job titles on the teams, this was not fatal. (ECF No. 172 ¶¶ 18–19.) Administrative assistants are not analogous to the other employees selected for termination in the Consumer Sales 2006 RIF, and the omission of these positions would also have been apparent from the attached Exhibit B. The waivers are accordingly valid.

### 4. Corporate Innovation Organization (CIO) 2006

The Innovations 2006 RIF refers to a reduction K-C implemented in three areas within what it called the Corporate Innovation Organization in September of 2006. Those three areas, according to the Separation Agreements, included Innovation Center – NATO, Enterprise Growth Incubator, and Innovation Training Recruiting. (Ex. 8, ¶ 15.) A total of 33 employees, six of whom are plaintiffs, were selected for termination as a result of this RIF out of a total of 282.

Plaintiffs' primary challenge to this RIF is that the actual decisional unit is much broader. According to plaintiffs it should have included "the entire [Research & Development]/[Corporate Innovation Organization]" including not only the above referenced 33 employees from 2006 but also: (1) a 2005 RIF from the Analytical and Measurement Technology group; (2) a 2006 RIF from the Essential Sciences group; (3) a 2008 RIF from the Corporate Innovations Organization; and (4) a 2008 RIF from the Enterprise Growth Incubator team. Plaintiffs argue that K-C's Innovations 2006 RIF "affected many of the same subgroups that were touched by the two previous RIFs" (number 1 and 2 as listed above). (Pl. Br. in Sup., ECF No. 71 at 51.) Plaintiffs see a common thread running through the RIFs because the Innovations 2006 Exhibit B listed some of the same employees who had been previously listed in the Exhibit Bs from the two earlier RIFs. (Foster Aff., ECF No. 73, ¶ 21.)

Here again, plaintiffs' argument that K-C failed to comply with the OWBPA is premised on their own opinion of what the decisional unit should have been, as opposed to the unit from which K-C actually selected the employees for separation. As noted above, K-C did consolidate three RIFs into one decisional unit, showing a willingness to consolidate RIFs where appropriate. A decisional unit should "reflect the process by which an employer chose certain employees for a program and

ruled out others from a program." 29 C.F.R. § 1625.22(f)(3)(i)(B). Here, plaintiffs focus on the fact that between 2005 and 2008 K-C's Research and Development Group underwent significant changes while changing into the so-called Corporate Innovation Organization. But this long-term organizational change does not equate to "a single process" by which K-C "chose certain employees" for termination. *Id.* Instead each RIF that affected the broader Research and Development area was initiated at different times and involved different sub-groups, or decisional units of employees. The mere fact that some employees were considered for — and listed on the Exhibit Bs of — multiple RIFs does not mean all five RIFs were part of a single process. Essential Sciences was merged with Innovations – NATO, following the earlier RIF in that department. Since NATO was one of the three departments whose employees were considered for termination for the Innovations 2006 RIF, members previously considered for termination during the Essential Sciences RIF were included on the Exhibit B disclosure for the Innovations 2006 RIF. But the Innovations 2006 RIF covered many more employees than were considered for the earlier Essential Sciences RIF. Thus, the decisional units for the two RIFs were different, and the cumulative disclosure rule did not apply.

Plaintiffs also argue that K-C's disclosure concerning the Innovations 2006 RIF is insufficient because it failed to inform the individual employees in writing in a manner calculated to be understood by the average employee as to what class, unit, or group of employees the RIF was intended to cover. While plaintiffs do not take issue, for purposes of this argument, with the Enterprise Growth Incubator and Innovation Training Recruiting portions of the RIF, they argue that the use of the term Innovation Center – NATO was materially misleading because no such department or unit was identifiable in September 2006, when the RIF was announced.

Notably, plaintiffs' argument is based entirely on their attorneys' analysis of certain K-C documents. That fact that many of the employer's documents do not reflect recent changes in organizational structure, however, is not evidence that a unit created as a result of those changes does not exist. Plaintiffs point to no testimony of their own, whether by declaration or deposition, indicating that they did not understand what organizational unit K-C meant by Innovation Center – NATO. K-C, on the other hand, has responded to plaintiffs' attorneys' analysis with declarations of Cheryl Perkins, the Senior Vice-President and Chief Innovation Officer who headed the Corporate Innovation Organization starting in January 2006, and Rob Everett, her deputy who led the Innovation Center – North America, which became Innovation Center – NATO in March 2006. (Decl. of Cheryl Perkins, ECF No. 97 ¶¶ 1, 12; Decl. of Rob. Everett, ECF No. 86, ¶¶ 15-16.) Everett, in particular describes the formation of Innovation Center – NATO, along with Innovation Center – Asia, in March 2006, and the merging of what remained of Essential Sciences after the March RIF. An attached email substantiates his account of the formation and existence of such an organizational unit, and an organizational chart shows its make-up just prior to the September RIF. (Everett ECF 86, Ex. A and B.)

In the face of the evidence offered by K-C and absent any evidence of actual confusion on the part of the plaintiffs affected by the Innovations 2006 RIF, I conclude that K-C is entitled to summary judgment as to the release plaintiffs signed as to this RIF as well. Here, K-C used objective criteria in describing the relevant decisional units — the Innovation Center – NATO, Enterprise Growth Incubator, and Innovation Training Recruiting and Career Development Departments — and the employees listed in the relevant Exhibit B exactly matched the described decisional unit. (ECF No. 172 ¶ 23.) The waivers were accordingly valid.

**5. North Atlantic Consumer Products 2006**

K-C's decisional unit disclosure stated:

[Employee's] relationship with KCC is ending as part of a group reduction-in-force program. Six areas within the North American Consumer Product organization were selected for a headcount reduction in order to further the Organizational Redesign associated activities. These six areas are: Baby and Child Care Products and Technology Development, Marketing Services, Product Supply, Customer Supply Chain, Customer Development, and Marketing. Certain persons within these six areas were considered for the program.

(DSF ¶¶ 223, 267.) Exhibit B to the separation agreements identified 276 employees, 57 of whom were identified as those selected for involuntary termination. Three of these 57 are plaintiffs.

The portion of the Separation Agreement identifying the decisional unit suffers from the same defect as the Separation Agreement for the Essential Sciences RIF. What sort of decisional group is "certain persons?" What types of neutral, objective criteria were used to scale down the listed six areas within K-C's North American Consumer Product organization? Since K-C does not delve into further detail, employees would have no way to evaluate the likelihood their age played in termination decisions and the waivers are invalid.

This uncertainty is further highlighted by K-C's own supplement to the record. By K-C's own admission, the description, in its current incarnation, would have included 3,326 salaried employees (and up to 7,737 employees if hourly employees were also included in the list.) (ECF No. 172 ¶ 27.) However, the Exhibit did not identify all of these employees but instead only listed 276 employees. Affected employees had no way to assess the strength of their claims from such a randomly narrowed sample of North American Consumer Products employees. As such, this set of waivers is invalid.

### 6. Family Care Network of the Future

Between 2005 and 2008 K-C reorganized its distribution network. K-C sought to increase efficiency by consolidating and streamlining the manner in which its products were distributed. It reduced the work of the roughly seventy distribution centers associated with specific manufacturing plants or mills, and created regional distribution centers capable of packaging and distributing the full range of K-C products that would be run by third-party logistics companies. As a result of this change, K-C no longer required the number of employees at the distribution centers associated with its mills. K-C was initially able to reduce the workforce at these plants through normal attrition as the regional centers came online. In 2008, however, K-C decided that a RIF was required at two of its remaining mill or plant distribution centers: one at Fullerton, California, and the other at Beech Island, South Carolina. Two plaintiffs — one from a California warehouse distribution facility and the other from a South Carolina warehouse distribution facility — were terminated after their bosses considered several employees and determined the two were no longer necessary in light of the reorganization. K-C laid out the decisional unit as follows: "[E]mployee's relationship with KCC is ending as part of a group reduction-in-force program. Employees in the Distribution Centers at Fullerton and Beech Island whose jobs were impacted by the Family Care Network of the Future project were included in this reduction-in-force program." (DSF ¶ 304.) Exhibit B to the separation agreement stated that seven employees were considered for reduction, two of whom were selected for reduction. (DSF ¶ 305.)

K-C's decisional unit description is insufficient. It failed to reasonably identify the decisional unit from which the terminations were to occur. Instead of specifically identifying the employee group from which the terminations were to occur, it simply advised the employees that

*certain* employees at those two distribution centers — employees whose positions were impacted by the company's reorganization — were considered for termination. This qualification is unhelpful. Presumably, all of the employees were impacted by the company's reorganization. In any event, such a vague description fails to meet the requirements of the OWBPA. In fact, K-C's Exhibit B identified all employees in the Distribution Centers at the time the selection decisions were made, except for 40 hourly employees. (ECF No. 172 ¶ 7.) There is no reason K-C could not have clearly identified the group of employees affected. It could have restricted itself to salaried employees, or to distribution employees, or to any other identifiable and meaningful grouping." K-C's failure to accurately describe the decisional unit in its disclosure renders the waivers signed by the employee invalid. *See Kruchowski*, 446 F.3d at 1095 ("Defendant failed to provide the correct, mandated information when it informed plaintiffs that the "decisional unit" included all salaried employees of the Mill. Because the information defendant provided did not meet the strict and unqualified requirement of the OWBPA, the Release is ineffective as a matter of law.").

### 7. 2008 Innovations – Corporate Innovations Organization

K-C defined the decisional unit in the Separation Agreement as: "Employees in the Innovations CIO Department were considered for this reduction-in-force program." (DSF ¶ 333.) The accompanying Exhibit B lists the job titles and ages of 63 employees considered for termination and annotates the 19 employees, including four plaintiffs, selected for termination. (DSF ¶¶ 334–335.)

Plaintiffs complain that the 2008 Innovations CIO RIF was subject to cumulative disclosure and, accordingly, that K-C should have included the September 2006 CIO RIF in the 2008 decisional unit. Plaintiffs, however, have no evidence that the two CIO RIFs were actually

successive stages in a single RIF.  The mere fact that two RIFs took place in one department in a company does not require cumulative disclosures where, as here, there is undisputed evidence that the two RIFs are separated by over a year, involved different decision makers, were implemented for different reasons, and were facilitated by different human resources managers.  Plaintiffs' disagreement with K-C's decision-making process does not create an issue of fact.

K-C included all employees of the Innovations CIO Department on Exhibit B lists. (ECF No. 172 ¶ 38.)  For the reasons repeatedly discussed above, K-C properly formulated a decisional unit and described its legitimately derived decisional unit with enough detail so as to give employees an informed choice.  The waivers in this section are accordingly valid.

### 8. North America Customer Development

K-C's final RIF, and corresponding decisional unit disclosure, stems from 2008 layoffs in the North America Customer Development group.  K-C's decisional unit was presented as: "Employees in select departments within Customer Development North America were considered for this reduction-in-force program.  Those departments included: NA Customer Development (Business Analysis, Sales, Training, Strategic Grocery, Strategic Speciality and US Retail Operations) and NA Customer Supply Chain (Strategy Development and Supply Chain Analysis)." (DSF ¶ 359.)  Exhibit B for this RIF contained the job titles and ages of the employees considered for the RIF.  (DSF ¶¶ 361–362.)

Plaintiffs argue K-C should have combined the 2008 North America Customer Development RIF with earlier reductions in force related to the same overarching sales organization.  But plaintiffs rely on conjecture to support their theory that the 2008 RIF was simply a later iteration of earlier RIFs. The difference between plaintiffs' own assessment and K-C's factually supported

position does not establish a genuine issue of material fact. There is no evidence that, at the time K-C implemented the 2006 RIF, it knew another RIF would take place. More importantly, the pool of employees from which the 2008 RIF terminations were made was significantly broader than the 2006 pool of employees. The 2006 RIF involved three regional teams, two support function teams, and three strategic teams — a total of 257 employees. (DSF ¶¶ 119–138.) The 2008 RIF, in contrast, drew from a much wider group of 870 employees from the North America Customer Development group and from the North America Supply Chain group. (Def. Rep. Br., ECF No. 147 at 7.) K-C has presented undisputed evidence that the two RIFs were separate, leaving no genuine issues of material fact.

These waivers are thus valid, for the reasons discussed above. K-C provided notice that employees within the listed Customer Development North America Departments were eligible and all of these employees were listed on the corresponding Exhibit B. (ECF No. 172 ¶ 41.) The notice provided to employees was adequate.

## CONCLUSION

For the reasons set forth I conclude that plaintiffs are entitled to summary judgment on the three aforementioned separation agreements (Essential Sciences, North Atlantic Consumer Products 2006, and Family Care Network of the Future ). Based on the undisputed facts before me, I find that with these select RIFs K-C failed to comply with the requirements of the OWBPA. K-C has failed to demonstrate that the disclosures provided sufficient detail as to the employees considered so as to provide those terminated with an "informed" choice; the Exhibit Bs did not correspond with the

vague descriptions given in the Separation Agreements.  K-C had the burden to demonstrate validity and has not done so with respect to this major element of the waivers.

However, as to the other five RIFs discussed above (AFC P&TD 2006, Consumer Sales 2006, Innovations 2006, Innovations CIO 2008, and NACD 2008), K-C did comply with the requirements of the Act.  The disclosures provided sufficient means for employees to make an informed decision as to their likelihood of success going forward with an age discrimination claim and thus the remaining waivers are valid as a matter of law.  Accordingly, and for the reasons set forth above, K-C's motion for partial summary judgment (ECF No. 77) is **DENIED in part** and **GRANTED in part** and plaintiffs' motion for partial summary judgment (ECF No. 70) is **DENIED in part** and **GRANTED in part**.  The Clerk is directed to set this matter on the Court's calendar for a telephone conference to discuss further scheduling.

**SO ORDERED** this __21st__ day of February, 2012.

s/ William C. Griesbach_____
William C. Griesbach
 United States District Judge